Olin Corporation v. One Beacon America Good morning. May it please the court. My name is Bryce Friedman. My firm is Simpson Thatcher & Bartlett, and I'm here to argue on behalf of One Beacon. I'd like to begin by addressing the questions this Court left open in the Olin 3 decision. First, the Court should rule that the prior insurance provision applies when a loss is covered under the One Beacon policies, and a prior excess policy issued by a different insurer exists. Second, the Court should remand and instruct the District Court that One Beacon's occurrence limits in the 1970 policies are reduced by the full limit of prior insurance issued by London market insurers. Let me take up the first piece in a little more detail. The plain language of the contract say that, quote, if any loss covered here under is also covered in whole or in part under any other excess policy, end quote, the prior insurance provision applies. The phrase any other excess policy means just that. It is not limited to other excess policies issued by One Beacon. Olin has offered no other plain language interpretation of the provision. Nonetheless, the District Court erred by rewriting the contract to say that the prior insurance provision applies only if the loss is covered by another excess policy also issued by One Beacon. But you say there's no ambiguity there. It applies not just to the same insured but other – same insurer but other insurers as well. That is correct. Completely clear. It's not ambiguous at all. That is correct. And if you think Even if it doesn't make sense the way you want to interpret it? It absolutely does make sense. And if you think about the New York Court of Appeals decision in Viking Pump, which came out after the District Court's judgment in this case, there is absolutely no other way following the logic of Viking Pump to rule in this case. Before the court in Viking Pump were policies issued by other insurers. And the Viking Pump court said that it, quote, enforces non-accumulation clauses in accordance with their plain language, despite the limiting impact that such clauses may have on an insured's recovery. It said that with policies issued by multiple insurers before it. Did it address this language in Condition C, though? The language is quoted on page 1153 of the Viking Pump decision. It didn't answer precisely the question that is before this Court. But there is no other way to understand the logic of Viking Pump. Viking Pump said the logic of our decision is this language in the policy requires an all-sums determination. Having decided that this language applies in all-sums determination, you need to apply it as written. And I would suggest, Your Honor, you do what the – Your Honors, you do in part what the District – what the New York Court of Appeals did in Viking Pump, and feel free to look to Delaware. Delaware is a court that has contract interpretation rules very similar to New York, and Delaware has long had to deal with Condition C and the non-accumulation clause. Because Delaware has had an all-sums allocation that Viking Pump said applies in New York recently. And in Delaware, the Viking Pump Chancery Court decision itself at footnote 165 said, quote, these non-accumulation and prior insurance provisions apply even where multiple insurers are involved, end quote. In Hercules v. AIU, which was a decision in the Delaware Superior Court, the Delaware Court applied this prior insurance provision, the same exact language, and said the home insurance company's limits are reduced by the London market insurer's limits. The same thing that one beacon is asking the Court to do here. In DuPont v. Stonewall, the – These questions weren't certified to the New York Court of Appeals in Viking Pump, right? These precise questions were not, so the Court of Appeals was limited to what it could answer. But the – as I indicated, I believe the logic of Viking Pump makes it correct to apply the non-accumulation and prior insurance provisions here. Would you like to make this argument to the New York Court of Appeals? I would be happy to if you're – if this Court chooses to ask the New York Court of Appeals, but I don't think it's necessary. I think it's sort of a gimme. I think that the logic of Viking Pump leads to the conclusion based on the plain words that it must apply to the other insurers. And again, I think the Delaware courts and the courts that have been dealing with this issue for a long time make it clear that that is the case. Even if – let's say the prior insurance provision doesn't – isn't limited to prior policies issued by the same insurer, and we agree with you on that. I'm having trouble seeing how it could be the case that the bare fact that there is a prior insurer and there's a prior insurance policy that might potentially cover a loss means that your client could be absolved of all responsibility. My client is not absolved of all responsibility, first of all. And I think that the Court of Appeals in Viking Pump recognized that under a particular fact pattern, given the insurance that the policyholder bought, it could result that a particular policy would not have to pay because it was reduced by the occurrence limits of prior policies. We are absolutely not absolved of all responsibility. And what the Court of Appeals said in Viking Pump is you have to apply the plain language of the policy as written, even though it has a limiting impact on the insurer's recovery and, of course, by extension, that of an injured plaintiff. And the New York Court of Appeals has had at least two cases before it in which there's been an injured child and it has applied the non-accumulation prior insurance provision to reduce the recovery available to those injured children. Unfortunately, in those cases, that was the plain language of the policies as written. Now, the other point to make about those cases that were before the court, such as New York Court of Appeals like Geraldo, is that when an insurance company wants to have a prior insurance provision limited to insurance policies that itself issues and not other companies' issues, it can say so. And all of those cases that have reached the New York Court of Appeals on this issue have said the same policies issued before by this company. These policies don't say that. They refer to any other excess insurance policy. So the second – that leads naturally, I think, to the next question, which is, okay, so you've decided that there's prior insurance and it applies to any insurance issued by any other company. So the next element is there has to be amounts due under the prior insurance. And here, we – the district court didn't reach the question because it answered the first part of the question in a way that we think was incorrect. But here, I've asked that the court remand with instructions to reduce the limits by amounts due under the London insurance policies. The only issue before the open issue on that question is the following. Olin says we settled the London insurance policies before we got a judgment in this prior insurance policies issued by London. That is incorrect. Amounts due is set at the time the policy is written and the loss happens. Olin is confusing the concepts of amounts due and amounts due and payable. The insurance contract uses those terms differently, and New York law uses those terms differently. Amounts are due under the terms of the insurance contract as written without regard to whether the money is payable today. And the reason for that is – let's look at – Give us an example from the current situation. I absolutely will. So Condition J of the policy, which is the loss payable provision, which the parties have briefed, says that my client, One Beacon, has to pay 30 days after it receives a definite claim. And the words it uses are amounts become due and payable 30 days after receiving a definite claim. Due and payable are two different things. In the Stronghold decision, this Court, for purposes of statute of limitations under an insurance contract, evaluated 100 years of New York law and said a cause of action accrues under an insurance contract when amounts become due and payable because those are two separate things. So, for example, I crash my car. I take it to my garage. I call my insurance company. Let's just call it Allstate. I say, Allstate, I crashed my car. I'm going to take it to the garage to get the bumper fixed. They don't have to send me a check, but you know what? They have amounts due to me. Those amounts become payable once I send them the bill for the new bumper. They have to pay me. Under the terms of our policy, it would be within 30 days. So let's not confuse amounts due with amounts payable. And here – The import of my question was what happens with the – how is it factored in, the amounts that have been settled for with the other insurance companies? Correct. So the amounts that are due under the prior insurance policy, the court – all the court – district court needs to do is apply the facts found by the jury to the prior insurance policy, just like the district court found the facts and applied them to our insurance policy. It so happens the prior insurance policy in this case has the exact same words as our insurance policy, so we know the answer. We know the answer. The amounts are due under the prior insurance. And I urge – if Your Honor is any concerned about this, look at the Third Circuit's decision in Liberty v. Treesdale. Policyholders do what the Third Circuit called as alchemistic machinations in order to avoid the import of this clause. They will settle. They will pretend the policy didn't exist. They will sue one person before the other, all to avoid the import of the prior insurance provision. The Second – the Third Circuit went through at least 20 different machinations that policyholders would do to avoid this amounts due issue. And where the bottom line is, where they came out and where logic in New York law takes you, is that you look at what the plain language of the prior policy says, just like the district court did with respect to our policy. Correct me if I'm misunderstanding, but here we seem back in the arena of absolved of all responsibility. And that seems, in this case, to be inconsistent with Viking Pump, which says that you can sue on any policy. They've sued on your policy. So why shouldn't they – why shouldn't the right result be that we look at the settlement not as going back to zero? Whatever they settled for, we're going to say, in theory, it should have been the prior insurer that's responsible for the loss, but just do some sort of set-off. I think you're taking an overly narrow view, respectfully, of absolved of all responsibility, because based on what Olin thought the law was, they chose in this case, in this trial below, to pursue just the 1970 policies. By my calculation in preparing for this argument, if there is a correct reallocation pursuant to my reading of Condition C, there will be other one-beacon policies in prior years that have responsibility. And there will be other insurers in private years that have responsibility. So I think to say that because this guy gets off because this is the only thing before us is an overly narrow view of the world. And by the way, I would also refer the Court to the Squibb decision that this Court issued, which basically says – and I'm going to sum it up – is that when somebody settles, you take the risk of that settlement, that it will be enough, whereas in the Squibb case, it was too much. And so you are entitled to the benefit or the burden of that. And that is the circumstance that we have here. Thank you, Mr. Friedman. You've reserved two minutes for rebuttal. Thank you. Mr. Martin? Good morning, Your Honors. Craig Martin on behalf of Olin Corporation. Given the argument, what I'm going to focus on is essentially the same types of issues. And let me begin by saying this. The argument that you just heard means that Olin bought this policy and will recover zero under this policy. So it does absolve all responsibility under this policy. They paid their premium for nothing. Because of the numbers. Yeah, because of the numbers. That's where it takes you to. But let me take you back through three things, okay? And I'll go through them in order. One is, there are really, when you cut through all of those big briefs you have, there are three things that you need to look at. One is the policy. Two is the decision in Olin 3. And three is the Viking Pump decision. And I'll start with Viking Pump, Olin and the policy. Olin 3 and the policy. What those three decisions essentially stand for, what those principles stand for looking at condition C of the policy is this. An insured, the Olins of the world, that's now the law of New York, that the insured gets to pick the policy, a stack, whatever stack they're going to go up to in terms of years, 1970, 1960, whatever. And they get to sue that insurer. And there is vertical exhaustion. So you go up the stack, you vertically exhaust. That's clear in Viking Pump. It's one of the two certified questions. The other issue that was addressed in Viking Pump, and also addressed in Olin 3, was essentially this. Do you get to recover for the entire occurrence? And in Olin 3, looking at condition C, this court essentially held that you're able to forward and sweep back damages into the current policy period under the language of that particular provision. Now, this court, I believe, felt constrained by other holdings that were prior to that. And the Viking Pump case then comes along and adds to that, looking at the very same type of provision, and in fact, the very same language as I read it. And the Viking Pump case essentially stands for the proposition then, not only do you look at the occurrence and you go forward in time from 1970, but you look at the occurrence and you go backward in time as well. So you get to go vertically up the tower, and you recover for the entire occurrence. So the numbers, just to give them to you, and that's why we point this out, they actually, we have $41 million in compensatory damages, then pre-judgment interest. That actually moves from $41 to $55 million under the Viking Pump decision, once you add Viking Pump. So those are the two basic principles that you have in addition to the policy language itself. So then the next question. Can I ask you just to focus on the all-sums holding of Viking Pump 2, and how that affects your judgment here? Yes, and let me see if I can explain it colloquially to you. Here's the way I read Viking Pump and Olin 3. I read Viking Pump and Olin 3 as being consistent in the sense that you get to go forward with regard to an occurrence. And then I read Viking Pump as you also get to go backward. So that's the incremental teaching of Viking Pump, if you will. If you read law review articles, and we've read law review articles, and in fact, they were cited in Olin 3 and Viking Pump, insurance lawyers talk about things like all-sums and pro-rata. And those things actually have some meaning with regard to how the regime works. So the way the regime actually works when you go into an all-sums environment, which is what the New York Court of Appeals chose to do, is you pick an insurer, you sue the insurer, you recover from the insurer. That is a pro-policyholder position. It makes it easier for the policyholder. And it obviously has a policy bent to it. The insurers then have the ability to go after each other. They have the ability to go after each other under equitable contribution doctrines. The measure of recovery has been altered by Viking Pump, hasn't it? Yes, it's been increased. So why don't you tell us what you think it does? So Viking Pump in this case, and the judgment is before this court, increases our compensatory damages from $41 million to $55 million. We'd ask the court to make that finding. It's all in the record. And then this court would have to remand so that you have to so that the district court could calculate the pre-judgment interest on the additional $14 million, approximately. That's what would be left for a remand. Wouldn't the district court also have to calculate the new damages based on all-sums as opposed to pro-rata? Why isn't that a district court job rather than ours? Um, look, typically it would be a district court job. Since the law changed while this appeal was on appeal and the numbers are all before this court, it is much simpler for this court to just do the math which is in the briefs and go ahead and enter $55 million and then let the district court calculate the pre-judgment interest. And that's why we make this suggestion. It's completely clear under Viking Pump and the math that was already found by the jury and is in the briefs from the district court what the math would be. And how would you take account of the prior settlements? The prior settlements, um, with respect to the prior settlements, there is all kinds of case law with regard to when one insurer goes after another insurer for equitable contribution that deals with how they account for prior settlements between themselves. And New York, New York, the court of appeals in Viking Pump, has taken the position that we get to recover from an insurer and then under the all sums regime, as it's read in many, many places, the insurers can go after each other for equitable contribution and so forth. There may be, and in that litigation, should there be that litigation, right? Should it not be some side deal that they do in London? With respect to that litigation, they may make arguments like the types of arguments that Your Honor was talking about in your questions. Is it just an offset or is it something else? And it may depend on other arrangements between them, because they may be reinsured by one another, which I think is what the record would show if the record were developed. So with respect to the prior settlements, there is all kinds of case law with regard  how they account for prior settlements, right? All right. Mr. Martin, I may be confused, but just to get the benefit of your thoughts on this. So in substance, the Condition C, first paragraph, which your adversary has argued requires setoffs or we're not going to pay until you've gotten everything else from everybody else. Your position is, well, go ahead. Your position is Viking Pump says, no, we get what we want out of you, and then you can go back and get it out of the other folks? Yeah. Point one is Viking Pump takes you to all sums regime. You go back and get it out of the other folks. That's the choice that the New York Court of Appeals made. Then point two, which I didn't get to yet, is this. If you look at that policy language, and I'll start with the amounts due provision, there are no amounts due here. The record has no evidence of any amounts due from any other insurer or from this insurer, and there is no adjudication of any amounts due by a prior insurance policy. There is no acknowledgement by a prior insurer that they have any amounts due. But those settlement payments were a result of claims leveled against the insurer pursuant to a policy. Yeah. I mean, look. And the adversary made a pretty good argument about my car insurance, that the amounts due when I get in the accident and I say, hey, pay me. Oh, if it were only so. If it were only that easy that you could knock on your insurance company's door and all of a sudden they would pay. There's this process. Maybe you've had good experience with your car insurance. I haven't had such great experience with my home insurance. But there is this process that you go through in which you actually make a notice, make a claim, and frequently, and in this case, the insurer raises 26 affirmative defenses and then sues you after you give 15 notices over eight years that they don't respond to. That's not really amounts due. Now, with regard to the- I guess what's troubling me that in a world in which we go to Viking Pump, it seems that your approach to this prior insurance provision amounts to saying that the insured can get a double recovery. Sue, that's- Sorry. Explain to me how I'm misunderstanding that. Not at all. And in terms of the purpose of Condition C, which was- we discussed at some length during the Olin III argument. The purpose of Condition C, which was written in the 1960s by London, was essentially to make sure that an insurer, that insurer issuing that policy, only paid one limit per occurrence. And that's acknowledged, I think, in Olin III. I think it's acknowledged in Viking Pump. In terms of- that's the purpose, I think, of these two provisions that are in this particular policy. With regard to going back to the amounts due provision, the amounts due provision- look, I make the point that there are no amounts due here. There's no evidence of amounts due. You don't even know what amounts due means. And if you- So before we go- Yes. Before- and sorry to interrupt you. Give me an example of how an amounts due would work. You say here there are no amounts due. When would there be an amounts due? I wish I knew the answer to that question because I actually don't. And I don't mean to be coy about it at all. In terms of the amounts due provision as written in this policy and applied to these types of claims is hopelessly ambiguous. And there's a law review article that is cited in the opinion in Olin III. It's also cited in Viking Pump. It's authored by a fellow named French. And it's at 60 University of Kansas Law Review 375-377. And it goes through a couple of paragraphs and talks about how the amounts due provision, small a, small d, not defined in the policy by the insurance company that wrote the contract of adhesion, right, with regard to the amounts due policy provision, that it is hopelessly ambiguous. What is it that, you know, just as a theoretical matter, suppose we have prior policies that would cover the same exact thing and they would zero out this policy as we suggested when I began. The- what is it that would make it an amounts due? Is it just the fact that there's a policy and a theoretical claim? Is it the fact that we give a notice? Is it the fact that they- we file a proof of claim? What- when they send us the let- the reservation of rights letter that says 26 defenses? When they sue us in a declaratory judgment and they raise, you know, 80 affirmative defenses only to try two at trial? Is it when the court actually enters judgment because we've prevailed? Is it when the court of appeals affirms? Maybe it's somewhere short of a check actually coming in the mail. How do you make that determination in any logical way from this provision as it's written? So that- that takes us to it's- it's ambiguous as it applies to this particular situation. And that takes you to the doctrine that I cannot pronounce, contrapreferordum. Latin means the- the insurance company win- or the insurance company loses and the insured wins. There is a third- that's fancy English for Latin. There is- there's a third point that I want to make before I sit down. If- if I can make two quick points. One is on the any other insurance language that gets lots of play that's in condition C. And the- look, I go right back to the purpose. Is that ambiguous? Well, I think it actually is. And- How do you resolve that ambiguity? Usually you go back and you talk to the people who made the contract. It's a little hard to do that here. So how do you resolve that ambiguity? You rule in our favor. And you- On the basis of that Latin doctrine? That Latin doctrine. You rule in our favor. And you'd have to go back to 1960 to look at the contract of adhesion drafted in London as those law reviews talk about for a purpose that is actually more- even more limited than this. We talked about it at the last oral argument. It had to do with accident and occurrence. In terms of- but that- you know, the whole purpose is to limit it to one occurrence for this particular insurer. Not for- they're not protecting some other insurer. They're certainly not protecting the insured. And, you know, and I ultimately fall back to the position that it is actually ambiguous. And in the last decision in Nolan III, Your Honor went through this type of discussion when you found that it was at any other level of the policy. You- I won't say that you added those words, but that's the way you interpreted the provision. I think you didn't do that based on ambiguity from the way I read the opinion. But you would know. In this case, you actually could repeat footnote 21 from Nolan III, which says you don't need to decide the issue. Because you are- the first two points are you're back in an all-sums regime. And in an all-sums regime, we get to sue the insurer. And then you let the insurers figure it out. Second, the amounts due provision is ambiguous as it applies. So there is no amounts due. We win. Third, you come to the other insurance provision. There is- if I can have 20 seconds to just say, we have this cross-appeal. And we're going to give Mr. Friedman lots of time on rebuttal, just so he's not worried. Okay. With respect to- we have a cross-appeal under 93A. What happened in the district court is the district court stayed discovery. We had the trial. The district court then granted a motion for summary judgment. So we, in effect, did not get discovery under our Massachusetts 93A claim. In terms of- the briefs cover this a lot, but I just want to point it out to you. What is really the core of the 93A claim? And when you cut through all the briefs, what should you look at? Our basic- in addition to all the things we say about lack of investigation and so forth, this is what we want to develop as we go back and take testimony and depositions and discovery. We believe that One Beacon delegated its claims handling duties to a company called NECO, a reinsurer of One Beacon with conflicts of interest. That they allowed the sub-delegation of its claim handling duties to certain third parties, including Resolute up in Massachusetts, an unregulated entity, not an insurance company. They allowed that unregulated entity to make payment decisions based on financial targets, not the merits of claims, and we think that that's an unfair practice. There is a case called Commercial Union v. Gillette, which is cited in the briefs, decided by the Massachusetts Superior Court that stands for that proposition. There is also an Estee Lauder case that we cited in our briefs. We were able to take one deposition in which we were able to figure out a little bit of this. We'd like to take more because we think that that is the core of the unfair practice that emanates from Massachusetts, and we should be allowed to take discovery and get into that issue before our legs are cut out from under us on a summary judgment motion. And that is exactly what the Massachusetts statute is, we think, intended to address, is that type of conduct. Thank you for indulging me with extra time. Thank you, Mr. Martin. And Mr. Friedman, you'll have free reign, more or less. Thank you, Your Honor. Don't overdo, but... Let me try and hit some of the points I heard. First of all, let's deal with this concept of the label of all sums. The one lesson from Viking Pump that we should all take is that the New York Court of Appeals does not like New York being labeled an all-sum state or pro-rata state or any other insurance lingo state. What happens in New York is you read the words of the contract and you apply the words of the contract. I thought you were going to say stays in New York. Well, that too. But... I don't know what your clerks think of that. So I think here what that means is, and the lesson of Viking Pump is you have to apply the words of the prior insurance provision. What I heard my colleagues stand up here and say is, because New York is all sums, you ignore the words of the prior insurance provision. And New York says the opposite. And hence, my invitation to look to Delaware, who's been dealing with it and applying it to reduce prior insurance for years. Second point, amounts due and the record. I agree that a remand is appropriate to do the math. None of us, we're all here because we're not great at math. We should go down and have the remand and Judge Rakoff, who the case has been reassigned to since the judgment was issued, deal with the math question of how to reduce by amounts due. What I think this court should address is the issue that is squarely before it, which is how do you deal with these settled policies? And I think I've expressed that in my opening argument, which was you just look at them and you apply them to the facts that are before the court and were found by the jury. The same way the court below applied the jury's findings to our policy, they can be applied to the prior policy. And if the court is interested, the prior policies are in the record. So we don't need to augment the record to do this. This is really a mechanical record exercise. It's starting at appendix page 284, going all the way to 633. I don't advise reading them. It's just hundreds of pages of the prior insurance policies. Plus, we also have the jury verdicts in the record. The other thing I wanted to mention is a little bit more about the Viking Pump decision. The Viking Pump decision very clearly says, and non-accumulation clauses like the one we have here, prevent stacking. The situation in which an insured who has suffered a long-term or continuous loss has triggered coverage across more than one policy period, wishes to add together the maximum limits of all consecutive policies that have been in place during the period. That's what the plain language of our policy does. It says you can't do that, Olin. And the Viking Pump court says that must be enforced. That doesn't mean they don't get what they paid for. And that, along with the Latin, is the policyholder's last refuge often, what it means is they only paid for one occurrence limit per occurrence across their insurance program, and they are getting exactly what they paid for, one occurrence limit. Does it matter whether the occurrence limits that I just don't recall are identical or different? Let's just say the prior occurrence limit, I'm making this up, this is in the facts and the record, is 5 million in the prior, and we have 10 million. Ours is reduced by 5, and we pay the additional 5. What I commend to the court is not the article that my colleague referred you to, but the article that the New York Court of Appeals relied on explicitly in making its decision in Viking Pump, written by somebody named Jan Michaels. And if your clerks are like my associates, they printed you the electronic version of the article. And the electronic version of the article is missing the very helpful chart, and it's a diagram that literally explains how this works. And the chart is on page 732 of the paper copy, and it shows you exactly, in a situation that mirrors this one, almost exactly how it works. This is not very controversial. It's applied in Delaware all the time. It's a little bit of math. Okay. So your adversary, Mr. Martin, I think would suggest in response, and let me, I may be characterizing it, and you can certainly disabuse me of that, that under Viking Pump, you pay 10 and you go back for 5. Absolutely not. And the mistake he's making there is he's saying that's the way it works in all sums world. And that's what he said up here. But we are not in an imaginary all sums world. We are in a Viking Pump world where you enforce the words that are on the page, and the words on the page, the to be enforced, say you reduce by the amount of the prior insurance. The amount that I, you don't create another litigation. You just do a little math to reduce by the amount of the prior insurance issued by any other excess insurer. You don't have more litigation. You just do a little bit of math. I hope that answers your question. Yes. Prejudgment interest is an important question in this case, given that it makes up more than half of the judgment, and my colleague mentioned it, so I just want to say two words about prejudgment interest. One of which we could have done a better job of highlighting in our brief. There's two reasons the prejudgment interest decision is incorrect. I think it's undisputed that under CPLR 5001, you commute prejudgment interest from the date the action accrues. In stronghold, as I said before, the action accrues when the amounts become due and payable. There's no finding, and the district court did not accrue interest from when it became due and payable. He accrued interest from when the amounts were incurred, and that's a mistake. The policy says amounts become due and payable after a definite claim. That's the car accident example I gave. And two, after exhaustion of the underlying insurance, and this is where our brief was not as perfect as it could be. This is sort of basic insurance law. After the primary insurance, the excess insurance play is next, and this is the citation we should have done a better job of highlighting. At page 2166 and 2182 of the appendix are the language in the two of the three policies that are issued. And what that language says, and that's 19 of the $20 million in that year. And what that language says is, it is expressly agreed that liability shall attach to the company, meaning my client, only after the underlying umbrella insurers have paid. Liability attaches to my client only after the underlying insurers have paid. So, if Olin incurred expenses to clean up the mess in the river in 1984, and the underlying insurers have not paid or been held liable to pay the full amount of their limit until 1990, there is no way that prejudgment interest or cause of action accrues against my client until 1990. That is a finding that is absent from the record, and Olin sponsored a different finding below. So, that is a mistake on prejudgment interest, aside from the issue of the sending a bill for the bumper, which is making a definite claim, which is plainly in the policy. Olin doesn't really contest that these are conditions and things that have to be met. They somehow say they've been waived. And I don't think you can, two things. You can't waive the thing I just read to you because it's in the insuring agreement of the policy. The second point is, it's really got this whole thing backwards. If I can waive a defense by asserting it, and that's essentially what they've said. They've said, you've litigated, you asserted these defenses for 25 years, therefore, you've somehow waived them. And that just cannot be the case. That cannot be the case. Last point I'd like to make, and thank you for indulging me, relates to this McIntosh issue because I think that could simplify the case. You know, there was a stipulation before the district court that Olin's counsel in the trial court below signed that said, any claim relating to McIntosh is dismissed with prejudice. The district court said that was a mistake. Olin hasn't tried to defend the fact that it was a legal mistake on appeal because it wasn't. What Olin is saying that the word McIntosh is ambiguous. I say the word McIntosh is not ambiguous because it's the same exact word Olin used in its complaint. But I just want to point out this. If the word is ambiguous, the result of entering judgment for Olin is incorrect. If the word is ambiguous and there are two potential meanings to the word McIntosh, which there aren't, you've got to send it back for a trial, and what's the meaning of the word McIntosh? And with that, unless there is anything further, I appreciate the indulgence of the time. Oh, 93A. Please, thank you. My colleague was reminding me. Quick points on 93A. Three and a half points. In order to assert a 93A claim, it has to be primary – the conduct has to – the case has to be primarily and substantially arised from Massachusetts and be focused in Massachusetts. This is a judge question. That's what the SJC in Kuwaiti Danish indicated. This is a judge question, not a question for a jury. This is a judge question. The longest decision in this case is four pages of transcript on this question, in which the district court said the center of the action is here in New York. Under Bushkin, which is a Massachusetts Supreme Judicial Court case, it says there are three main factors. Where's the plaintiff? Where was the plaintiff harmed? And where's the site of the bad conduct? I'm assuming that that's all true, everything Olin says. I'm assuming that Olin is outside of New York – outside of Massachusetts. It was harmed outside of Massachusetts. The only thing that happened in Massachusetts was the guys who were supposed to handle these insurance claims have an office there. Under Bushkin – under Bushkin, that claim is properly dismissed as not primarily and substantially arising in Massachusetts. And – and we have more than Bushkin here. We have a finding, a not clearly erroneous finding from the district court, that the center of the action was here in New York, and that shouldn't be disturbed. So we have Bushkin plus in this case. Second of all, if you – if you realize this, what the federal court in the Riker case said about 93A is very important. It said Massachusetts courts do not provide 93A claims to non-residents trying to recover for allegedly unfair trade practices of a corporation in Massachusetts under a statute designed to protect against in-state frauds. What does that mean? That means we don't protect people like Olin from allegedly bad conduct by claims handlers sitting in Massachusetts. And the flips – and the application of that is in the primarily and substantially test, and the law that says a contract governed by New York law cannot – cannot give rise when it is intertwined with – to a 93A claim. And you don't need to take my word for that. Take the word of the First Department in the Colgate case, which was somebody suing One Beacon. Colgate, a New York company, sued One Beacon, and the First Department said, consistent with Massachusetts law, you do not have a 93A claim in that circumstance where there's a contract governed by New York law. So Olin has two responses to that, that – one major response I'll deal with that, which is this is not a contract claim, they say. This is a statutory tort claim. I have an easy answer to that. Their statutory tort claim is all about the bad claim handling that One Beacon and the person it hired to do the claims handling for them did. It wouldn't exist but for the insurance contract. Everything that they complain about in – under Massachusetts law, that I had to call them back, that I had to send them letters, that my claim file shouldn't be empty, I wouldn't have to do any of that if we didn't have an insurance contract. It is – not only is this intertwined with the insurance contract, the whole thing depends on it. And the cases they cite, Mueller – there's three cases they cite. Mueller is one of them, and there's two other cases along the same lines. None of those cases – I urge Your Honors to take a look. None of those cases have a New York contract at issue. None. We are the – they protect in-State policyholders, not out-of-State policyholders. Last one, statute of limitations is easy. This case has been around for 30 years. The case has been around for 30 years. They were on inquiry notice, and I appreciate it, Your Honor.